**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| THE COUNTY OF HUDSON, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 06-319 (JAP) |
| | : | |
| ROBERT C. JANISZEWSKI, et al., | : | |
| | : | **AMENDED OPINION** |
| Defendants. | : | |

---

On January 23, 2006, the County of Hudson ("the County"), Hudson County Executive

Thomas A. DeGise ("DeGise"), the Board of Chosen Freeholders of the County of Hudson ("the

Board"), and the Hudson County Improvement Authority ("HCIA") (collectively "Plaintiffs")

filed a complaint against numerous persons and entities,[1] alleging a variety of statutory and

common law causes of action, including allegations of violations of the federal Racketeer

Influence and Corporate Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, and the New

Jersey RICO Act, N.J.S.A. 2C:41-1 *et seq.*, ("NJRICO").  The essence of Plaintiffs' allegations is

that Defendants defrauded Plaintiffs by engaging in a scheme whereby certain Defendants bribed

their co-Defendant former Hudson County Executive Robert Janiszewski ("Janiszewski") in

exchange for the award or renewal of public contracts or other favors from the County.  Plaintiffs

also named as a defendant Western Surety Company ("Western Surety"), which issued fidelity

bonds in respect of Janiszewski covering the period of September 3, 1991 through September 3,

---

[1]  Plaintiffs named as Defendants: Robert C. Janiszewski, Gerard A. Lisa, Lisa &
Associates, P.C., Jay Booth, Jersey Capital Markets, Inc., Tri-State Capital Corp., M.H.
Meyerson & Co., Crown Financial Group, Red-Horse Securities, LLC, Charles Fallon, Fallon &
Fallon, LLP, Oscar Sandoval, M.D., Hudson County Psychiatric Associates, Oscar Sandoval,
M.D., P.C., Nidia Davila-Colon, and William Braker (collectively "Defendants").

2004.  As to Western Surety, Plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and N.J.S.A. § 2A:16-50 to -62, "to determine the respective rights, duties and obligations of the parties to this litigation under the Western bonds."  (Plaintiffs' Complaint ("Cmplt.") ¶¶ 145 and 152).

On March 24, 2006, Defendant Oscar Sandoval, M.D. ("Sandoval"), a psychiatrist conducting business under the entities Oscar Sandoval, M.D., P.C. ("Sandoval P.C.") and Hudson County Psychiatric Associates ("HCPA"), (collectively "Sandoval") raised various counterclaims against Plaintiffs and filed a Third-Party Complaint against Third-Party Defendants Janiszewski, Donald Scarinci, Richard Myrlak, Geoffrey Perselay, Abraham Antun, Robert Murray, and one or several fictitious persons.  Sandoval specifically alleges that Third-Party Defendants engaged in a fraudulent scheme of extortion, in violation of the RICO Act, and that Third-Party Defendants retaliated against him for his cooperation with the Federal Bureau of Investigation ("FBI") in respect of this fraudulent scheme by failing to renew the Sandoval entities' public contracts.  (Third-Party Plaintiffs' Complaint ("TP Cmplt.") ¶¶ 48-51, 55-56).[2]

Presently before the Court are motions by multiple Defendants for summary judgment and to dismiss Plaintiffs' Complaint, a motion by Western Surety for summary judgment in respect of damages or in the alternative to limit damages, a motion by Plaintiffs to dismiss Sandoval's counterclaims, and motions by Third-Party Defendants to dismiss the Third-Party Complaint.  For the reasons set forth herein, the Court grants the motions for summary judgment

---

[2]  Sandoval also attempted to amend his Third-Party Complaint so as to include other public officials in the scheme of which he complained.  In a comprehensive opinion dated September 13, 2007, Magistrate Judge Tonianne J. Bongiovanni denied his attempt to so complicate this case as to render it beyond description or control.

and to dismiss Plaintiffs' Complaint brought by Janiszewski, Fallon and Fallon, LLP, and

Sandoval; denies Western Surety's motion for summary judgment as to Plaintiffs' Complaint;

grants Western Surety's motion to limit the damages sought by Plaintiffs to the period of

September 3, 1993 through November 30, 2000; grants Plaintiffs' motion to dismiss Sandoval's

counterclaims; and grants the motions to dismiss the Third-Party Complaint brought by Third-

Party Defendants Scarinci, Myrlak, Perselay, Antun, Murray, and Janiszewski.

## I.    BACKGROUND

Although this is a civil case, the conduct which forms the basis of Plaintiffs' allegations

was the subject of previous criminal proceedings.  The Complaint alleges that, beginning "no[]

later than 1993," Janiszewski, in his official capacity as County Executive, accepted bribes from

co-Defendants, various county vendors, in exchange for securing for those Defendants service

contracts with the County.  (Cmplt. ¶¶ 28 and 35).  Janiszewski served as County Executive for

Hudson County from January 1, 1988 through October 1, 2001.  In accordance with N.J.S.A.

40A:5-34, Western Surety issued a series of Official Bonds to Janiszewski in his capacity as

County Executive, covering the period between September 3, 1991 and September 3, 2004.

Between September 3, 1991 and September 3, 1996, three series of Bonds each provided a penal

sum of $100,000.  The Bond covering the period from September 3, 1996 through September 3,

2000 was originally issued as providing a penal sum of $100,000, but was increased on June 30,

1999 to $350,000.  The final Bond, effective from September 3, 2000 through September 3,

2004, provided a penal sum of $350,000.

On September 6, 2001, Janiszewski sent a letter of resignation to Third-Party Defendant

Antun, the County Administrator, indicating that his resignation would be effective October 1,

2001.  Janiszewski sent a copy of this letter to the County's Members of the Board of

Freeholders, as well as County Counsel and Chief of Staff.  Upon Janiszewski's resignation,

Antun assumed the position of County Executive.

   Janiszewski's resignation did not go unnoticed.  The following day, on September 7,

2001, three different news publications—*The Star-Ledger*, *The Record*, and *The New York

Times*—reported that Janiszewski resigned from his position as County Executive and that his

resignation was the result of an investigation by the Federal Bureau of Investigation ("FBI") of

political corruption within the County.  (Defendant Western Surety's Brief for Summary

Judgment ("WS Br.") Ex. F).  A follow-up article, re-iterating much of the same information,

appeared on September 8, 2001 in *The New York Times*.  On September 30, 2001, *The Star-

Ledger* reported that the FBI permitted Janiszewski to have his personal effects removed from his

County office on September 28, 2001 and that it was speculated that the FBI had a video

surveillance tape of Janiszewski accepting a bribe from a county vendor.  On October 8, 2001,

*The New Jersey Law Journal* published an article stating that the FBI caught Janiszewski

accepting bribes from Sandoval, who had worked with the FBI, and that, after being caught,

Janiszewski cooperated with the authorities to expose others involved in the bribery scheme.

Three more articles discussing much of the same content were published in *The Record*, *The New

York Times*, and *The Star-Ledger* on October 11, 2001, October 12, 2001, and December 8,

2001, respectively.

   Notably, on September 27, 2001, Hudson County officials declined to renew Sandoval's

contract with the County to provide psychiatric care to two county jails and a county psychiatric

hospital.  Sandoval, through his entities Sandoval P.C. and HCPA, had been providing these

services pursuant to contracts with the County since 1995.  (TP Cmplt. ¶ 3).  The County also refused to consider a bid by HCPA for a County contract in 2002.

On October 3, 2002, Janiszewski pled guilty to extortion under color of official right, in violation of 18 U.S.C. § 1951, and tax evasion, in violation of 26 U.S.C. § 7201.  Subsequently, Lisa and Fallon also entered guilty pleas in respect of charges for the use of the mails to execute a scheme to defraud the citizens of Hudson County, in violation of 18 U.S.C. §§ 1341 and 1346.  In addition, Fallon pled guilty to a charge of tax fraud, in violation of 26 U.S.C. § 7206(2).

On February 25, 2003, Plaintiffs, through County counsel, informed Western Surety that they sought a claim against the Bonds issued on behalf of Janiszewski, by virtue of Janiszewski's involvement in the bribery scheme.  On March 25, 2003, Western Surety's representative responded to Plaintiffs' letter, notifying Plaintiffs that, in order to process any claim against the Bonds, they would have to complete Notice of Discovery and Proof of Loss forms.  More than one year later, on August 23, 2004, Plaintiffs submitted the completed Notice of Discovery and Proof of Loss forms, seeking a claim under the Bond issued during the period of September 3, 1993 through September 3, 2004.  On October 6, 2004, Western Surety, through its representative, responded and explained that it needed additional information, including "[a] statement of actual damages incurred during each term of office."  (WS Br. Ex. N).  Further correspondence ensued between February 2005 and January 2006, whereby Western Surety continually requested additional information from Plaintiffs.

On January 23, 2006, Plaintiffs filed the present cause of action in this Court.  Currently before the Court are the following motions: Janiszewski's motions for summary judgment and to dismiss Plaintiffs' Complaint; Fallon and Fallon, LLP's motion for summary judgment as to

Plaintiffs' Complaint, incorporating Janiszewski's motions; Sandoval's motions to dismiss

Plaintiffs' Complaint and to convert the motion to dismiss into a motion for summary judgment;

Western Surety's motion for summary judgment as to Plaintiffs' Complaint; Western Surety's

motion for summary judgment as to damages or, in the alternative, to limit damages; Plaintiffs'

cross-motion to dismiss Sandoval's counterclaims; Third-Party Defendant Scarinci's motion to

dismiss the Third-Party Complaint; Third-Party Defendants Myrlak, Perselay, Antun, and

Murray's motion to dismiss the Third-Party Complaint, incorporating Scarinci's motion; and

Janiszewski's motion to dismiss the Third-Party Complaint as barred by the applicable statute of

limitations.  Plaintiffs and Third-Party Plaintiffs oppose the relevant motions.[3]

## II.    DISCUSSION

### A.    Applicable Standards of Review

#### 1.    *Standard of Review under Federal Rule of Civil Procedure 12(b)(6)*

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss if

the complaint fails to state a claim upon which relief can be granted.  Previously, the standard of

review under Rule 12(b)(6) permitted dismissal "only if it appear[ed] that the plaintiffs could

prove no set of facts that would entitle them to relief."  *Watson v. Abington Twp.*, 478 F.3d 144,

151 (3d Cir. 2007) (internal quotations omitted).  Recently, however, the United States Supreme

Court dispensed with that standard:  the "'no set of facts' language has been questioned,

criticized, and explained away long enough. . . .  [T]his famous observation has earned its

---

[3]  For purposes of clarity, the Court recognizes that, before it, are motions to dismiss and for summary judgment in respect of three pleadings: (1) Plaintiffs' Complaint; (2) Sandoval's counterclaims brought against Plaintiffs; and (3) the Third-Party Complaint.  The Court will therefore address the various motions in that context.

retirement." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007).

The *Twombly* Court refashioned the standard and found that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 1964-65 (internal citations omitted); *see also Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]" (internal quotation marks omitted)).  Therefore, for a complaint to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Twombly*, *supra*, 127 S. Ct. at 1965 (internal citations and footnote omitted).

## 2.    *Standard of Review under Federal Rule of Civil Procedure 56(c)*

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are critical or "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, *supra*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

**B.    Analysis**

**1.    *Motions as to Plaintiffs' Complaint***

**a.    Motions on the Basis of Statute of Limitations**

Defendants Janiszewski, Fallon and Fallon, LLP, Sandoval, Sandoval P.C., HCPA, and Western Surety all seek summary judgment and/or a dismissal of Plaintiffs' Complaint, pursuant to Federal Rules of Civil Procedure 56 and 12(b)(6), respectively, on the basis that Plaintiffs' Complaint is untimely filed. Defendants argue that the applicable statute of limitations required Plaintiffs to bring their claims within four years of actual or constructive discovery of the alleged "pattern of racketeering." According to Defendants, the action accrued in September 2001, thereby mandating that Plaintiffs file any claims under the RICO Act or NJRICO by September

2005, which was four months prior to Plaintiffs' actual filing of their Complaint.  Defendants argue that Plaintiffs should have known that Defendants were involved in a racketeering scheme upon notice of Janiszewski's resignation on September 6, 2001 or, at least, upon the publication of numerous articles in local newspapers, all of which reported the alleged bribery scheme. Plaintiffs oppose the motion, responding that they did not know, and could not have known, the extent of the scheme or the actual basis of the FBI investigation from those publications because the articles did not make public that Defendants' "corrupt scheme involv[ed] the procurement of illegal county contracts[.]"  (Plaintiffs' Opposition Brief ("Pls.' Opp. Br.") at 10).  Plaintiffs, however, do not dispute that the applicable statute of limitations is four years.  Rather, Plaintiffs submit that there exists a question of material fact as to the accrual date of the action; that is, when Plaintiffs should have known that they could assert civil RICO claims against Defendants.

Although "RICO does not provide an express statute of limitations for actions brought under its civil enforcement provision[,]" the Supreme Court of the United States has clarified that a four-year statute of limitations applies in this context.  *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 146, 156-57 (1987) (analogizing civil RICO claims to civil claims brought under Clayton Act, 15 U.S.C. § 15).  Similarly, NJRICO does not explicitly provide an express limitations period, but New Jersey state courts have construed the statute as imposing a four-year statute of limitations.  *In re Liquidation of Integrity Ins. Co.*, 245 N.J. Super. 133, 137 (Law Div. 1990) (analogizing civil NJRICO claims to civil claims brought under New Jersey's Antitrust Act, N.J.S.A. 56:9-14).  Thus, Plaintiffs must have filed their Complaint within four years of the accrual of their RICO claims.

To ascertain when a civil RICO cause of action accrues—that is when the clock begins on

Plaintiffs' four-year period in which they may bring a cause of action—the Court applies the

"injury discovery rule." *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 233 (3d

Cir. 2004).  Under that rule, the Court "must determine when the plaintiffs knew or should have

known of their injury." *Forbes v. Eagelson*, 228 F.3d 471, 484 (3d Cir. 2000), *cert. denied*, 533

U.S. 929 (2001).  "In addition to the injury, the plaintiffs must also have known or should have

known of the source of their injury. . . .  [N]othing more than these two requirements [is]

required to trigger the running of the four-year limitations period[.]" *Prudential*, *supra*, 359 F.3d

at 233 (internal quotations and citation omitted).  Moreover, a burden-shifting analysis ensues

under this inquiry:

> To defeat summary judgment if Defendants come forward with evidence that
> Plaintiffs' actual injury occurred outside the limitations period, Plaintiffs then bear
> the burden of coming forward with sufficient evidence to demonstrate they neither
> had knowledge of the injury nor knowledge of facts which would have triggered an
> obligation to investigate further.  If the evidence in the record is such that no
> reasonable jury could find that Plaintiffs did not know and should not have known
> of their injuries before the expiration of the limitations period, summary judgment
> for Defendants is warranted.

*Blystra v. Fiber Tech Group, Inc.*, 407 F. Supp. 2d 636, 641 (D.N.J. 2005) (internal citation

omitted).

Application of the injury discovery rule to determine when Plaintiffs' cause of action

accrued involves both a subjective and an objective consideration: first, whether Plaintiffs had

actual knowledge of their alleged injury caused by Defendants; and, second, whether Plaintiffs

had "inquiry notice" of their injuries.  *See Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239,

250-51 (3d Cir. 2001).  In respect of the latter inquiry, the Court of Appeals for the Third Circuit

has held that "inquiry notice should be analyzed in two steps."  *Id.* at 252.  The first step requires

that Defendants show the existence of "storm warnings," *ibid.*, meaning "any information or accumulation of data that would alert a reasonable person to the probability" that Defendants have engaged in wrongdoing, *Cetel v. Kirwan Fin. Group, Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (internal quotation marks omitted).  Significantly, "[t]he existence of storm warnings is a totally objective inquiry[]" and "Plaintiffs need not be aware of the suspicious circumstances or understand their import." *Mathews*, *supra*, 260 F.3d at 252.

Once the defendants bear that initial burden, the Court must proceed to the second step, at which "the burden shifts to the plaintiffs to show that they exercised reasonable due diligence and yet were unable to discover their injuries." *Ibid.* "This inquiry is both subjective and objective.  The plaintiffs must first show that they investigated the suspicious circumstances[ and then the Court] must determine whether their efforts were adequate[.]" *Ibid.* (footnote omitted). This last step, shifting the burden to the plaintiffs, is important because "[t]he object of civil RICO is . . . not merely to compensate victims but to turn them into prosecutors, private attorneys general, dedicated to eliminating racketeering activity." *Rotella v. Wood*, 528 U.S. 549, 557 (2000) (internal quotations and footnote omitted).

The issue thus becomes when did Plaintiffs know, or should have known, that they suffered an injury from Defendants' alleged scheme of racketeering.  As a threshold matter, the Court must define Plaintiffs' alleged injury.  *See E. Steel Constr., Inc. v. Nichols*, 2004 WL 1878237, *5 (E.D. Pa. 2004).  According to the Complaint, the alleged injury suffered by Plaintiffs include the erosion of public confidence in government along with costs and other

financial losses.  (Cmplt. ¶ 74, 77).[4]

Next, the Court must determine when Plaintiffs had either actual knowledge or inquiry notice that a bribery scheme ensued within their County.  Because no party has proffered proof of Plaintiffs' actual knowledge of the "pattern of racketeering activity," (Cmplt. ¶ 73), the Court proceeds to the two-step analysis for determining when Plaintiffs should have known of their injuries.  First, the Court finds that Defendants have shown the existence of "storm warnings" sufficient to alert a reasonable person that Defendants had engaged in a scheme of accepting bribes in exchange for county contracts–the alleged injury sustained by Plaintiffs.  The Court further finds that the first of the storm warnings occurred on September 6, 2001, when the County received Janiszewski's notice of resignation.  Although the federal investigation into the corrupt scheme was not public prior September 6, 2001, the letter of resignation provided notice to Plaintiffs that Janiszewski could not perform his duties as County Executive.

Moreover, the three articles published in *The Star-Ledger*, *The Record*, and *The New York Times* on September 7, 2001 provided sufficient notice to Plaintiffs that Janiszewski and county vendors were the subject of a federal investigation into an alleged corruption scheme. The article in *The Star-Ledger* stated that Janiszewski "resigned yesterday after becoming

---

[4] Plaintiffs are governmental entities and, thus, the contours of this RICO claim are difficult to ascertain.  The Court recognizes that the fundamental goal of the civil RICO statute is to provide a remedy to those who suffer a business or property injury from a RICO violation.  *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 519 (1985) (Marhsall, J., dissenting) ("Congress' concern was not for the direct victims of the racketeers' acts, whom state and federal laws already protected, but for the competitors and investors whose businesses and interests are harmed or destroyed by racketeers, or whose competitive positions decline because of infiltration in the relevant market.").  Because the Court's decision on Plaintiffs' claims turns on the statute of limitations and not on the merits, the Court leaves for another day the complex questions attendant to the nature of the RICO injury and the appropriate measure of damages that may be recovered by a public entity.

ensnared in a federal corruption probe" and that "[l]awyers familiar with the matter said

Janiszewski was captured on surveillance tapes earlier this year during an FBI sting operation

involving a county vendor." (WS Br. Ex. F at 1). Significantly, the article also noted that

Janiszewski "ha[d] not been seen in his office or by friends for weeks, generating a growing swirl

of questions over his absence[,]" and that "he ha[d] had no contact with county officials . . . in

weeks." (WS Br. Ex. F at 1, 2). *The Star-Ledger* also discussed the atmosphere in the County's

offices:

> In Hudson County, in [Janiszewski's] spacious office suite just to the left of the
> marble lobby of the historic old county courthouse in Jersey City, the mood
> yesterday afternoon was dark, with some members of his staff openly sobbing. . . . "Obviously,
> it is somber around here today," said one secretary. "I'm just so disappointed; it's
> such a waste," said one of Janiszewski's aides. "The guy was brilliant with a great
> mind for policy, politics, everything. It's a shocker."

(WS Br. Ex. F at 3).

Similarly, *The Record* reported a state senator as saying that it was his "understanding

[that Janiszewski] resigned because he's being indicted." (WS Br. Ex. F at 5). The article also

stated that "[s]everal Democratic Party sources said Janiszewski had been confronted by the FBI

last fall and coaxed into becoming an undercover operative to avoid a lengthy prison term." (WS

Br. Ex. F at 5). It continued: "Since then, the sources said, he has helped the FBI gather

videotaped evidence of alleged bribery and other criminal activity, implicating vendors and

contractors doing business with the county." (WS Br. Ex. F at 6). *The Record* also quoted

Freeholder Chairman Silverio Vega as saying that "'[a]ll of us on the [Hudson County] Board of

Chosen Freeholders are shocked and saddened to hear of the county executive's resignation[, but

that n]ow is not the time for speculation or political posturing.'" (WS Br. Ex. F at 6). The

September 7, 2001 *New York Times* article reiterated much of the same news, but added that

> rumors about Mr. Janiszewski ha[d] been circulating since at least February.  For
> months, a growing number of Democrats and politically influential businessmen have
> related strange conversations with Mr. Janiszewski in which, they later came to
> believe, he had been trying to get them to talk about illicit or unethical activities. . .
> . The growing speculation that Mr. Janiszewski was cooperating with the authorities
> culminated on August 14, when federal investigators searched the Hoboken office
> of Joseph Barry, one of Hudson County's most prominent and politically influential
> real estate developers.  Several Democratic lawmakers and other officials in Hudson
> County said today that[,] before the search, Mr. Barry was confronted with
> information about him provided by Mr. Janiszewski.[5]

(WS Br. Ex. F at 10).

In an atmosphere where county employees "openly sobb[ed]" in the County's courthouse and County officials stated that they believed that Janiszewski and others were a part of a federal investigation into a bribery scheme—all public information published in newspapers—the Court finds it difficult to hold that Plaintiffs did not have inquiry notice of their alleged injuries upon Janiszewski's resignation or, at the latest, the following day when the news appeared in publications.  Further, the Court notes that Plaintiffs need not have had specific knowledge of which individuals were involved in the fraudulent scheme; inquiry notice is triggered when Plaintiffs should have known that they suffered a general injury, not when they should have known of every intricacy of that injury.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1326 (3d Cir. 2002) ("Plaintiffs need not know all of the details or narrow aspects of the alleged fraud to trigger the limitations period; instead, the period begins to run from the time at which plaintiff should have discovered the general fraudulent scheme." (internal quotation marks omitted)).  Indeed, "[u]nder an injury discovery rule, nothing more was required to trigger the running of the

---

[5]  The Court notes that, prior to the filing of this lawsuit, Plaintiffs settled all claims that could have been asserted against Joseph Barry.

four-year limitations period." *Forbes*, *supra*, 228 F.3d at 485.  As a result, the Court holds that Defendants have met their burden of proving the existence of storm warnings as of September 7, 2001, the accrual of Plaintiffs' RICO causes of action as to all Defendants.

Thus, the burden then shifts to Plaintiffs to prove the second step of the inquiry notice analysis: that is, that Plaintiffs exercised reasonable due diligence, but were nevertheless unable to discover their injuries.  Because Plaintiffs have not proffered any proof as to their efforts to discover their injuries, the Court finds that Plaintiffs have not met their burden on the second step.[6]  Moreover, absent a showing of reasonable diligence to uncover the basis for their claims, the Court must hold Plaintiffs "to have constructive notice of all facts that could have been learned through diligent investigation during the limitations period[,]" including the identity of those involved in the bribery scheme.  *NAHC*, *supra*, 306 F.3d at 1326 (internal quotation marks omitted).

There is sufficient proof that Plaintiffs should have known that they suffered an injury from Defendants' alleged scheme of racketeering on September 7, 2001, the date on which Plaintiffs' cause of action accrued.  Because Plaintiffs' action accrued on September 7, 2001, and because both the federal RICO Act and the NJRICO Act impose a four-year limitations period,

---

[6]  In their moving papers, Plaintiffs do not argue that the statute of limitations should have been tolled for any reason, but rather only argue when the limitations period accrued.  However, Plaintiffs alleged in their Complaint that, due to Defendants' efforts to conceal their conduct, Plaintiffs did not and could not have discovered the "pattern of racketeering activity until the conclusion of the federal criminal proceedings against [Defendants]." (Cmplt. ¶ 82).  The Court recognizes that the statute of limitations for a civil RICO cause of action is not tolled pending the return of an indictment for criminal RICO violations.  *Forbes*, *supra*, 228 F.3d at 489. Therefore, the Court, although it need not address the issue as not properly raised by Plaintiffs, finds that Plaintiffs cannot sustain a claim for application of equitable tolling on the basis of pending indictments against Defendants.

the Court finds that Plaintiffs' Complaint is time-barred in respect of its RICO and NJRICO claims in Counts One, Two, Three, and Four against all Defendants, as it was brought on January 23, 2006, more than four months after the limitations period ran.  The Court further emphasizes that Congress created a civil cause of action under the RICO Act as a means to ensure that those guilty of racketeering acts are held accountable for their actions.  *See Rotella*, *supra*, 528 U.S. at 557 (noting that civil RICO causes of action are aimed at turning private parties "into prosecutors, private attorneys general" (internal quotation marks omitted)).  Plaintiffs' Complaint, filed more than five years after notice of the alleged bribery scheme, does not further this goal of a civil RICO action.

Although the Court finds that Plaintiffs filed their Complaint outside of the statute of limitations for RICO and NJRICO causes of action, the Court nevertheless finds that Plaintiffs' Complaint was timely filed as against Western Surety.  In their Complaint, Plaintiffs seek a declaratory judgment as to Western Surety's obligations under the Bonds issued to Janiszewski. (Cmplt. ¶¶ 145, 152).  Ultimately, Plaintiffs seek to hold Western Surety liable "for the losses, damages and expenses incurred by Hudson County arising as a result of the wrongful, fraudulent and illegal performance by Janiszewski of his duties as Hudson County Executive."  (Cmplt. ¶¶ 147, 154).

This claim against Western Surety for the value of the Bonds is a matter of contract law. *See in re Liquidation of Integrity Ins. Co.*, 147 N.J. 128, 131, 135-36 (1996) (framing issue as "whether under basic principles of contract law [bond obligee] is entitled to file a claim for the full amount of the surety bond").  Because different principles of law attach to the claim asserted under the Bonds than those asserted against the other Defendants, the Court must apply the

-16-

statute of limitations appropriate for a breach of contract claim, rather than the four-year statute

of limitations applicable in a RICO or NJRICO claim.  Indeed, New Jersey statutory law imposes

a six-year statute of limitations on an action "for recovery upon a contractual claim or liability . .

. ."  N.J.S.A. 2A:14-1.

  This six-year limitations period begins to accrue on the date on which the right to bring a

cause of action first arises.  *Holmin v. TRW, Inc.*, 330 N.J. Super. 30, 35 (App. Div. 2000), *aff'd*

*without opinion*, 167 N.J. 205 (2001).  As found above, the Court has determined that Plaintiffs

knew of Janiszewski's involvement in a federal investigation into a bribery scheme with county

vendors on September 7, 2001.  The Court now also holds that Plaintiffs' cause of action against

Western Surety for the value of the relevant Bonds accrued on September 7, 2001, thereby

requiring Plaintiffs to assert their claims against Western Surety by September 7, 2007, six years

after the cause of action accrued.  Plaintiffs filed their present Complaint on January 23, 2006,

well within the period in which they could bring an action for recovery under the Bonds.  As a

result, the Court holds that Plaintiffs timely brought the declaratory judgment action against

Western Surety.

  Moreover, the Court recognizes that the failure of Plaintiffs to sustain a cause of action

against Janiszewski, the Bonds' principal, on the basis of the statute of limitations does not

preclude the action against the surety.  *See Weems v. Carter*, 30 F.2d 202, 203 (4th Cir. 1929)

(holding that "the running of the Statute of Limitation in favor of the principal[] does not

extinguish the obligation of a surety on a promissory note in whose favor limitation has not run"

(internal quotation marks omitted)).  Although "[t]he liability of the principal and the surety upon

the bond is in terms one and the same[,]" *Totowa v. Am. Sur. Co. of N.Y.*, 39 N.J. 332, 348

(1963), it is a generally accepted principle that the running of a statute of limitations bars recovery of the remedy, but does not extinguish liability, *R.A.C. v. P.J.S., Jr.*, 192 N.J. 81, 98 (2007).  Thus, the Court finds that the dismissal of Plaintiffs' Complaint against Janiszewski as time-barred does not preclude Plaintiffs from seeking recovery under the Bonds, where Plaintiffs timely filed their Complaint as to Western Surety.

Accordingly, the Court grants the motions for summary judgment brought by Janiszewski, Fallon and Fallon, LLP, Sandoval, Sandoval P.C., and HCPA and, therefore, dismisses Plaintiffs' Complaint as to the RICO and NJRICO counts asserted against them. However, the Court denies Western Surety's motion for summary judgment on the basis of the statute of limitations.

### b.    <u>Motion to Limit Damages</u>

In addition to moving for summary judgment on the basis of the statute of limitations, Western Surety also seeks summary judgment on the issue of damages and moves, in the alternative, to limit damages.  Western Surety initially argues that the damages recoverable by Plaintiffs in a claim against Janiszewski under RICO or NJRICO are punitive in nature and that, according to surety law, Plaintiffs cannot recover punitive damages from the Bonds.  The essence of this argument is that Plaintiffs' claim is actually one for disgorgement, an impermissible claim against a public bond.  Next, Western Surety argues that Plaintiffs' damages must be limited to the period beginning September 3, 1993 through September 3, 2000.  Western Surety's theory is that Janiszewski began cooperating with the federal authorities in November of 2000 and, because of this cooperation, Plaintiffs cannot sustain a RICO or NJRICO action against Janiszewski for the period in which he acted under the direction of the federal government.

Therefore, because Plaintiffs could not sustain a valid RICO or NJRICO action against Janiszewski, who could not be found to have misused his position as County Executive while under the guidance of the federal government, Western Surety argues it likewise cannot be held liable under the Bonds for Janiszewski's actions as to this time period.

Plaintiffs oppose Western Surety's motion. Plaintiffs argue that the Bonds assuring Janiszewski's conduct as County Executive cover, by their terms, the damages they now seek. In addition, although Plaintiffs do not challenge the start date proffered by Western Surety, they submit that they are entitled to recover under the Bonds covering the period through September 2004. Plaintiffs contend that the date of Janiszewski's cooperation with the FBI cannot be determined conclusively and that, even if the date could be ascertained, they continued to suffer damages from Janiszewski's conduct notwithstanding any cooperation. Moreover, Plaintiffs emphasize that they continued to be harmed by Janiszewski even after his resignation in September 2001 because "the contracts that had been illegally secured continued to run their course[ and] Plaintiffs continued to pay for these contracts[.]" (Plaintiffs' Letter Brief in Opposition at 3).

The Court first addresses Western Surety's motion for summary judgment on Plaintiffs' claim for damages on the basis that Plaintiffs essentially seek punitive damages. The Bonds each contained the following language:

> That we, Robert C. Janiszewski as Principal and the WESTERN SURETY COMPANY, a corporation duly licensed to do business in the State of New Jersey, as surety, are held and firmly bound unto the County of Hudson, State of New Jersey in the penal sum of One-Hundred Thousand and no/100 ($100,000.00) DOLLARS, to the payment of which some, well and truly to be made, we jointly and severally bind ourselves and our legal representatives firmly by these presents. . . .

(Defendant Western Surety's Brief on Damages ("WS D. Br.") Ex. B).  Although the Bonds

issued for the period of September 3, 1991 through September 3, 2000 provided for a penal sum

of $100,000, the Bond covering the period of September 3, 1996 through September 3, 2000 was

increased, on June 30, 1999, from the sum of $100,000 to $350,000.  (WS D. Br. Ex. B, T).  In

addition, the Bond covering the period of September 3, 2000 through September 3, 2004

provided for a penal sum of $350,000.  (WS D. Br. Ex. B).

      Because Janiszewski served as a county official, Western Surety's Bonds were issued in

accordance with N.J.S.A. 40A:5-34.  That statute provides, in relevant part, that "[a]ll bonds

shall be in such form, for such sum and with such surety as the governing body of the local unit

shall, by resolution, direct."  N.J.S.A. 40A:5-34.  Unlike other jurisdictions, New Jersey has not,

by statute or otherwise, limited the measure of damages recoverable under an official bond to

calculable compensatory damages.  *Cf. Nat'l Sur. Corp. v. Gatlin*, 15 S.E.2d 180, 182-83 (Ga.

1941) (applying Georgia statute to preclude recovery of punitive damages); *Bull v. Albright*, 47

So. 2d 266, 268 (Ala. 1950) (precluding recovery of punitive damages where claim brought

against official and surety was based "in tort and not on contract").  However, New Jersey courts

have recognized that "[i]t has long been settled law that a surety is chargeable only according to

the strict terms of its undertaking and its obligation cannot and should not be extended either by

implication or by construction beyond the confines of its contract[.]" *Monmouth Lumber Co. v.*

*Indem. Ins. Co. of N. Am.*, 21 N.J. 439, 452 (1956).  In other words, "[b]y the express provisions

of the bond[, a surety's] liability to the obligees is limited to the penal sum stated."  *Ibid.*

Moreover, "[a] surety will be liable beyond the penal sum only for interest with respect to its own

default, and ordinarily such further liability would arise only upon demand upon the surety to

-20-

pay." *Totowa*, *supra*, 39 N.J. at 349.

The purpose of official bonds, and ultimately N.J.S.A. 40A:5-34, is to provide assurance, through joint and several liability, to the public in the event a public official does not fulfill the duties and obligations required of his position. *Id.* at 347. To further that goal, "the surety on an official bond should answer for the same damages for which the principal obligor is liable." *Id.* at 348. This is based on the premise that "[t]he surety underwrites the principal's behavior; it vouches for him." *Ibid.* Therefore, "[t]he liability of the principal and the surety upon the bond is in terms one and the same." *Ibid.* Considering those principles, the Court rejects Western Surety's argument that Plaintiffs actually seek a disgorgement claim. *Cf. Essex v. First Union Nat'l Bank*, 186 N.J. 46 (2006) (discussing county's right to disgorgement claim). Indeed, Plaintiffs only intend to hold Western Surety liable for the penal sums provided for in the Bonds. Such a claim is not precluded by either New Jersey surety law or the Bonds themselves. As a result, the Court denies Western Surety's motion for summary judgment on the basis that Plaintiffs seek to recover more than the penal sum provided for in the Bonds.

The Court now considers whether Western Surety is entitled to a limitation on Plaintiffs' damages. Indeed, Plaintiffs' Notice of Discovery and Proof of Loss forms sent to Western Surety sought a claim against the Bonds covering the period of September 3, 1993 through September 3, 2004. Plaintiffs do not argue that its claims trigger the Bonds issued before September 3, 1993, but challenge Western Surety's argument that Janiszewski's cooperation with the FBI precludes them from seeking a claim under the Bonds issued after November 2000.

The record shows that Janiszewski began cooperating with federal authorities in November of 2000. (WS D. Br. Ex. H at 2). Essentially, Western Surety seeks to raise a defense

that could be raised by Janiszewski—that is, that Janiszewski could not have been engaged in "a pattern of racketeering activity" once he acted at the behest of the federal government.  18 U.S.C. §§ 1961, 1962; N.J.S.A. 2C:41-1 and -2.  The issue thus becomes two-fold: first, whether Janiszewski could successfully raise a defense to Plaintiffs' civil RICO action as to damages accrued after he began to cooperate with the FBI in November 2000; and, second, whether Western Surety can assert that defense of its principal against Plaintiffs' claim under the Bonds. In respect of the former consideration, the Court must determine if Janiszewski was engaged in "a pattern of racketeering activity" when he acted under the direction of federal authorities.  The inherent problem with holding that Janiszewski could have violated the RICO Act and NJRICO by his conduct after November 2000 is the concern of whether he could have had the requisite *mens rea* to the predicate offenses, while acting at the government's direction.  If Janiszewski did not have the requisite *mens rea*, then he could not be held liable for "a pattern of racketeering activity" for that period of time.

The Court of Appeals for the Third Circuit has noted that, although "[t]he RICO statute itself is silent on the issue of mens rea[, s]ome courts have held that RICO imposes no special mens rea requirement in addition to that associated with the underlying predicate crimes."  *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991) (internal citation omitted).  Here, the asserted underlying predicate crimes require the actor to have acted purposefully, knowingly, and/or willfully.[7]  Because Janiszewski clearly did not act on his own volition once he cooperated

---

[7] Plaintiffs allege in their Complaint that the underlying predicate crimes are mail fraud, 18 U.S.C. §§ 1341 and 1343, interference with commerce by threats or violence, 18 U.S.C. § 1951, interstate and foreign travel or transportation in aid of racketeering enterprises, 18 U.S.C. § 1952, bribery in official and political matters, N.J.S.A. 2C:27-4, acceptance or receipt of unlawful benefit by public servant for official behavior, N.J.S.A. 2C:27-10, and theft by

in the federal investigation, the Court cannot find that he acted purposefully or willfully after

November 2000.  Therefore, the Court concludes that Janiszewski would be able to raise a valid

defense against Plaintiffs as to the alleged damages suffered after November 2000 because

Plaintiffs could not show that Janiszewski committed the predicate offenses necessary to a

showing of "a pattern of racketeering activity."

Next, the Court also finds that Western Surety benefits from Janiszewski's defense.  As

noted above, "the surety on an official bond should answer for the same damages for which the

principal obligor is liable[]" because "[t]he liability of the principal and the surety upon the bond

is in terms one and the same."  *Totowa*, *supra*, 39 N.J. at 348.  Exceptions to this general rule

arise only where the principal's defenses are either by operation of law, such as a statute of

limitations defense, or of a personal nature, including defenses of infancy and insanity.  *R.I.*

*Hosp. Trust Nat'l Bank v. Ohio Cas. Ins. Co.*, 789 F.2d 74, 79 n.6 (1st Cir. 1986).  None of those

exceptions apply to this defense; in fact, the essence of the defense is that Janiszewski did not

violate the RICO Act or NJRICO after November 2000 and, thus, cannot be liable to Plaintiffs.

Because Janiszewski, as principal to the Bonds, cannot be found liable for a RICO or NJRICO

violation once he cooperated with the federal investigation, the Court holds that Western Surety,

as obligor, cannot be held liable either.  Therefore, the Court further holds that Plaintiffs'

damages asserted against Western Surety trigger only the Bonds covering the period between

---

extortion, N.J.S.A. 2C:20-5.  Plaintiffs also allege as a predicate offense the crime of offer of
unlawful benefit to public servant for official behavior, in violation of N.J.S.A. 2C:27-11.
Because Janiszewski, as County Executive, was the recipient of the bribes in the alleged scheme,
this predicate offense could not relate to his alleged offenses, but rather to his co-Defendants'
alleged offenses.  Therefore, the Court has omitted this alleged predicate crime from its
consideration on the present issue.

September 3, 1993 and November 30, 2000.

Ultimately, the Court grants Western Surety's motion to limit damages to the period between September 3, 1993 and November 30, 2000.  Accordingly, Plaintiffs' damages must be limited to the recovery of the penal sums in the three applicable Bonds:  that covering the period of September 3, 1993 through September 3, 1996, that covering the period of September 3, 1996 through September 3, 2000, and that covering the period of September 3, 2000 through September 3, 2004.[8]

## 2. *Motion to Dismiss Sandoval's Counterclaims*

Also before the Court is Plaintiffs' cross-motion to dismiss the counterclaims brought by Sandoval and his entities Sandoval P.C. and HCPA on the bases that such claims are time-barred by the applicable statute of limitations and, nonetheless, fail to state a claim upon which relief could be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Sandoval does not oppose this motion.  Nevertheless, "the Court must address an unopposed motion to dismiss a complaint for failure to state a claim on the merits."  *Mitchell v. N.J. Lottery*, 2006 WL 1344092, *3 (D.N.J. 2006).  In the counterclaim, Sandoval asserts a claim under 42 U.S.C. § 1983, alleging that Plaintiffs violated his First Amendment right to free speech by retaliating against him for his participation in the criminal prosecution of his co-Defendants.  Specifically, Sandoval alleges that the retaliatory conduct consisted of Plaintiffs' refusal to renew a county contract with HCPA

---

[8]  The Court notes that Western Surety sought to exclude from Plaintiffs' damages the Bond covering the period of September 3, 2000 through September 3, 2004.  However, Defendant's argument that Janiszewski did not begin to cooperate with federal authorities until November of 2000—whether it was on November 1, 2000 or November 30, 2000—indicates that Janiszewski's alleged illegal conduct extended past September 3, 2000.  Therefore, the Court finds that Plaintiffs' claims also trigger the Bond covering the period of September 3, 2000 through September 3, 2004.

and their filing of the present action against him.

Although a statute of limitations defense is usually unavailable in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), an exception arises "where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994). Finding that a determination can be made on the statute of limitations issue on the face of Sandoval's pleadings, the Court thus addresses whether the counterclaims are time-barred.

It is well-settled that actions seeking a remedy under 42 U.S.C. § 1983 are governed by the statute of limitations applicable to state personal injury claims, depending on where the cause of action accrued. *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989). In New Jersey, N.J.S.A. 2A:14-2 imposes a two-year limitations period for personal injury claims; therefore, claims brought under 42 U.S.C. § 1983 that accrued within New Jersey are subject to a two-year statute of limitations. *O'Connor v. Newark*, 440 F.3d 125, 126-27 (3d Cir. 2006). Although the applicable statute of limitations is governed by state law, federal law governs when the cause of action accrued. *Wallace v. Kato*, 127 S. Ct. 1091, 1095 (2007). Under federal law, "the standard rule [is] that accrual occurs when the plaintiff has a complete and present cause of action." *Ibid.* (internal quotation and editing marks omitted).

Here, Sandoval alleges two instances of retaliatory conduct, the first occurring on October 1, 2001 when he received notice that the County terminated the contract with HCPA, and the second occurring on January 23, 2006 when Plaintiffs filed the instant cause of action. Notably, Sandoval does not allege that these two discrete instances were a part of a pattern of retaliation.

-25-

*Cf. Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 303 (3d Cir. 2007) (considering one alleged retaliatory action, which would be insufficient alone, as a possible "link in the causal chain" of retaliation).  Because Sandoval filed his counterclaims against Plaintiffs on March 13, 2006, more than four years after Plaintiffs allegedly first retaliated against him, the Court finds that the counterclaim is time-barred to the extent that Sandoval alleges that Plaintiffs retaliated against him by refusing to renew HCPA's public contract with the County.  In respect of that claim, Sandoval could have sought relief under § 1983 beginning on October 1, 2001, upon notice that the County would not renew the contract.  Thus, Sandoval should have brought that § 1983 claim by October 1, 2003.  However, the Court notes that the second alleged retaliatory conduct—the filing of Plaintiffs' Complaint against Sandoval—occurred on January 23, 2006, the date of accrual of Sandoval's second § 1983 claim.  Thus, the two-year statute of limitations had not run as to that retaliatory conduct when Sandoval filed his counterclaim on March 13, 2006.  As a result, the Court limits its remaining inquiry to the allegation that Plaintiffs violated Sandoval's First Amendment rights by retaliating against him when Plaintiffs filed the Complaint against him.

In respect of that limited counterclaim brought by Sandoval, the Court holds that the counterclaim fails to state a claim upon which relief could be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  "To establish a section 1983 civil rights claim, a plaintiff must demonstrate that the conduct complained of was committed by a person acting under state law and that the conduct deprived him of rights, privileges or immunities secured by the Constitution."  *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994) (internal quotation marks omitted).  In the context of a retaliation claim under the First Amendment, "a

plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). However, in response, a "defendant may defeat the plaintiff's case by showing that it would have taken the same action even in the absence of the protected conduct." *Ambrose v. Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) (internal quotation marks omitted). The essence of this showing by a defendant is that it negates a plaintiff's allegation of a "causal link between the constitutionally protected conduct and the retaliatory action." *Thomas*, *supra*, 463 F.3d at 296. It is exactly this issue of causation at which Sandoval's counterclaim must fail.

As an initial matter, the Court notes that it does not decide here whether Sandoval has pled sufficiently the first two prongs of a First Amendment retaliation claim, but, rather, rules on the basis that Sandoval has failed to plead a causal link. To satisfy the causation element, in the context of a motion to dismiss, Sandoval "must raise the inference that [their] protected activity was the likely reason for the adverse action." *Mitchell*, *supra*, 2006 WL 1344092 at *3. Mere "unsupported conclusions and unwarranted inferences" that Plaintiffs filed their civil RICO claims against Sandoval in retaliation for his role in the investigation is insufficient to withstand a motion to dismiss. *Baraka*, *supra*, 481 F.3d at 195 (internal quotation marks omitted).

The allegation that Plaintiffs brought their Complaint in retaliation for Sandoval's involvement in the prosecution of his co-Defendants arises in one paragraph of the counterclaim:

> Since the present RICO action brought by [P]laintiffs is brought in their official capacity as Governmental Units, this action is brought under Color of Law in violation of 42[ ]U.S.C. Section 1983 and the First Amendment rights of Dr.

Sandoval.  This is clearer because the aim is retaliatory punishment for his participation in the prosecution of the convicted co-[D]efendants to the RICO suit.

(Sandoval's Answer and Counterclaim ("Counterclaim") at 25, ¶ 30).  Not only is this allegation an unsupported conclusion, but, through it, Sandoval essentially seeks to hold himself immune from any liability—either criminal or civil—for his involvement in the bribery scheme.

The Court also recognizes the countervailing constitutional issues present in a claim that seeks to preclude the filing of a complaint.  Plaintiffs have a "right of access to the courts [as] an aspect of the First Amendment right to petition the Government for redress of grievances."  *Bill Johnson's Rest., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).  The fact that federal prosecutors used their discretion to abstain from criminally prosecuting Sandoval does not cloak him in absolute immunity from civil liability, nor does it indicate that Plaintiffs' action, although time-barred, is not well-founded on facts that Sandoval was involved in the illegal scheme.  In the context of a lawsuit allegedly filed as an unfair labor practice, the Supreme Court has held that "[t]he filing and prosecution of a well-founded lawsuit may not be enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the Act."  *Id.* at 743.  That same logic applies here: Sandoval cannot escape civil liability by making an unsupported assertion that Plaintiffs seek to retaliate against him by filing a lawsuit that has significant public import.

Therefore, the Court holds that Sandoval has failed to state a claim upon which relief could be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) because the counterclaims of retaliatory conduct against Plaintiffs are time-barred and are insufficient "to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint

-28-

are true (even if doubtful in fact) . . . ." *Twombly*, *supra*, 127 S. Ct. at 1965 (internal citations and footnote omitted). The Court thereby grants Plaintiffs' motion to dismiss Sandoval's counterclaims in their entirety.

### 3.     *Motions to Dismiss the Third-Party Complaint*

Finally, before the Court are motions brought by Third-Party Defendants Scarinci, Myrlak, Perselay, Antun, Murray, and Janiszewski (collectively "Third-Party Defendants") to dismiss the Third-Party Complaint, which seeks relief under 18 U.S.C. § 1964(c).[9] Sandoval, in the Third-Party Complaint, alleges that Third-Party Defendants engaged in a pattern of racketeering acts, whereby they extorted money from and retaliated against him. (TP Cmplt. ¶ 47). Sandoval further alleges that this pattern of racketeering injured him in two respects: first, the amount of money he paid to Third-Party Defendants Janiszewski and Scarinci,[10] totaling $288,000, to "protect" the County contracts; and second, the value of HCPA's public contract, which Perselay and Antun allegedly refused to renew or to accept subsequent bids in retaliation for Sandoval's role in the criminal RICO prosecutions and his reporting to the County Freeholders alleged wrongdoing by Renaissance Behavioral Health, Inc., another holder of a county contract. (TP Cmplt. ¶ 50).

Presently, Third-Party Defendants seek to dismiss the Third-Party Complaint in its

---

[9]   Although Third-Party Defendants argue that the Third-Party Complaint does not make a claim upon which relief could be granted under NJRICO, Sandoval does not assert a claim under that State statute, but only under the federal RICO Act.

[10]   The Court recognizes that, although Sandoval alleges that Scarinci was involved in the bribery scheme, the criminal investigations did not implicate or result in a charge against Scarinci. Indeed, there is nothing to substantiate Sandoval's allegation that he paid any bribe to Scarinci.

-29-

entirety.  They argue that Sandoval does not have standing to bring a civil RICO claim because he was not "injured" within the meaning of statute.  In the alternative, the Third-Party Defendants claim that any civil RICO claim against them is time-barred and, nevertheless, fails to adequately identify a pattern of racketeering.  Sandoval opposes the motions, responding that he alleges a sufficient injury to sustain a civil RICO claim and that the RICO cause of action was equitably tolled until the completion of the criminal RICO cases against the co-Defendants, thereby accruing on "either June 4, 2008 or December 22, 2008."  (Third-Party Plaintiffs' Brief in Opposition ("TPP Opp.") at 14).

Section 1964(c) of RICO creates a private right of action that may be brought by any person "injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  To sustain a cause of action under § 1964(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted).  The Supreme Court has emphasized that "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."  *Ibid.*  The Supreme Court explained that,

> [w]here the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of these acts in connection with the conduct of an enterprise. . . .  Any recoverable damages occurring by reason of a violation of § 1962(c) [(the statute listing predicate offenses)] will flow from the commission of the predicate acts.

*Id.* at 497 (footnote omitted).

The United States Supreme Court has limited standing to sue under § 1964(c) to those

-30-

persons whose injuries are *proximately caused* by the defendant's alleged RICO violations.

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  Accordingly, proximate

causation requires "some direct relation between the injury asserted and the injurious conduct

alleged." *Ibid.*  Moreover, "a person may not bring suit under § 1964(c) predicated on a violation

of [a conspiracy to violate RICO] for injuries caused by an overt act that is not an act of

racketeering or otherwise unlawful under the statute." *Beck v. Prupis*, 529 U.S. 494, 507 (2000).

Applying those precepts here, the Court finds that Sandoval does not have standing to

assert a § 1964(c) claim as to the alleged injury that the County refused to renew the HCPA

contract in 2001 and to consider HCPA's bid in 2002.  The Third-Party Complaint alleges that

HCPA rendered psychiatric services to the County from 1995 to 2001.  (TP Cmplt. ¶ 3).  As a

contract with a public entity, the HCPA contract was governed by the New Jersey Local Public

Contracts Law, N.J.S.A. 40A:11-1 *et seq.*, ("LPCL").  The LPCL limits the duration of

professional contracts to "12 consecutive months."  N.J.S.A. 40A:11-15.  Moreover, a county

may exercise sound business judgment, in accordance with the guidelines set in N.J.S.A. 40A:11-

6.1, to accept or reject a public bid.  *Serenity Contracting Group, Inc. v. Fort Lee*, 306 N.J.

Super. 151, 157 (App. Div. 1997) ("Nothing in the Local Public Bidding Law or in the cases

decided thereunder suggests a legislative design to supplant all exercises of principled business

judgment by the contracting public entity that conform with the express provisions of the Law

and its underlying policies."), *certif. denied*, 153 N.J. 214 (1998).  This discretion is consonant

with the principle that a public official, in considering bids for a public contract, owes a fiduciary

duty to the public to act "for the public good, [and] not for the benefit of the bidder."  *M.A.*

*Stephen Constr. Co. v. Rumson*, 125 N.J. Super. 67, 73 (App. Div.), *certif. denied*, 64 N.J. 315

(1973).

Considering the Third-Party Complaint under that statutory framework, the Court finds that Sandoval has not alleged that Third-Party Defendants abused their discretion in refusing to renew the HCPA contract or to consider HCPA's bid in 2002, such that that conduct amounted to an unlawful act. A mere conclusory statement that the refusals resulted from Sandoval's involvement in the federal investigation and his complaints as to another health facility in the County is insufficient to prove that this injury is directly related to Third-Party Defendant's alleged racketeering scheme. In fact, the alleged injurious conduct—not renewing the contract and not accepting the 2002 bid—was legal conduct under the LPCL; and thereby Sandoval merely alleges an "injur[y] caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." *Beck*, *supra*, 529 U.S. at 507. Moreover, the Court recognizes the possible implications of permitting a civil RICO claim against a public entity, which exercised its discretion in not renewing a contract first obtained through bribery. As a result, the Court concludes that Sandoval does not have standing under § 1964(c) to bring a claim as to the County's refusal to renew or accept HCPA's bid for a public contract.

The only other injury alleged by Sandoval is the payment of the bribe he made to Janiszewski and Scarinci[11] in exchange for the County's acceptance of HCPA's bid for a public contract. (TP Cmplt. ¶ 49). Although flatly asserting that Third-Party Defendants extorted certain monies from him, entitling him to treble damages under the civil RICO statute, Sandoval, in the Third-Party Complaint, admits that he benefitted from those bribes as early as July 1997.

---

[11] The Court reiterates that the allegation that Sandoval paid bribes to Scarinci is unsubstantiated. Scarinci was never implicated or charged in respect to the bribery scheme.

The present case law is unclear as to whether standing to bring a civil RICO action requires that the plaintiff be an "innocent party" to the alleged RICO violations, *Roma Constr. Co. v. aRusso*, 96 F.3d 566, 570 (1st Cir. 1996), or whether the Third Circuit would permit a defense of unclean hands, *Northeast Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1353-54 (3d Cir.), *cert. denied*, 493 U.S. 901 (1989). *Cf. Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 693-94 (S.D. Fla. 2006) (permitting defense of unclean hands in civil RICO action). However, it appears to the Court that, if those doctrines were applicable in this instance, then they would bar Sandoval's claims. In this instance, the Court could not say that Sandoval was not actively engaged in the racketeering scheme, such that he did not also benefit from the illegal conduct. (TP Cmplt. ¶ 20).

Nevertheless, without concluding whether the doctrines of *in pari delicto* or unclean hands could be asserted in a civil RICO action, the Court finds that Sandoval has not alleged an actual injury in the form of a bribe payment because that payment resulted in numerous County contracts, valued by Sandoval himself to be over $ 4 million. (TP Cmplt. ¶ 50). Indeed, the Third-Party Complaint clearly shows that Sandoval did not sustain a business *injury* by paying bribes to Third-Party Defendants, but rather obtained a business *benefit* from those bribes, the returns of which lasted for years. *Cf. Hellenic Lines, Ltd. v. O'Hearn*, 523 F. Supp. 244, 248 (D.C.N.Y. 1981) (finding plaintiff-employer had standing to sue, despite employees' payment of bribes in alleged racketeering scheme, because plaintiff "was directly injured if, as alleged, it paid for services it never received" and where "it [could ]not be said from the pleadings presently before the court that [plaintiff] itself [was] guilty of engaging in racketeering activity").

Because the Third-Party Complaint is facially devoid of any allegation that Sandoval

suffered an actual injury, the Court holds that Sandoval does not have standing to bring a private cause of action under § 1964(c).  The Court, therefore, grants the motions to dismiss the Third-Party Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), brought by Third-Party Defendants.

## III.    CONCLUSION

In conclusion, the Court grants the motions by Janiszewski, Fallon and Fallon, LLP, Sandoval, Sandoval P.C., and HCPA for summary judgment and to dismiss Plaintiffs' Complaint; denies the motion by Western Surety for summary judgment as to Plaintiffs' Complaint; grants the motion by Western Surety to limit damages sought by Plaintiffs to the period of September 3, 1993 through November 30, 2000; grants the motion by Plaintiffs to dismiss Sandoval's counterclaims against Plaintiffs; and grants the motions by Third-Party Defendants Scarinci, Myrlak, Perselay, Antun, Murray, and Janiszewski to dismiss the Third-Party Complaint.  An appropriate order accompanies this Opinion.

/s/ Joel A. Pisano
Joel A. Pisano, U.S.D.J.


Dated:  November 2, 2007